IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| CAROLYN CALDERON, | ) | |
| | ) | |
| Plaintiff, | ) | CV-06-1621-PK |
| | ) | |
| v. | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| MICHAEL J. ASTRUE, Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |

PAPAK, Magistrate Judge:

## **INTRODUCTION**

Plaintiff Carolyn Calderon brings this action for judicial review of a final decision of the

Commissioner of Social Security denying her applications for disability insurance benefits (DIB) and

supplemental security income payments (SSI) under Titles II and XVI of the Social Security Act.

This court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3). The Commissioner's decision

should be affirmed and the case dismissed.

## BACKGROUND

Calderon was born March 4, 1951. Tr. 74.[1]  She has a high school education. Tr. 86. Calderon worked as an accounts representative in medical billing, an admissions clerk, and currently works on a part time basis as a front desk receptionist. Tr. 81, 483, 511. Calderon alleges disability from November 18, 1996, due to neck, shoulder, and arm pain, bilateral carpal tunnel syndrome, depression, and anxiety. She applied for DIB and SSI on December 13, 2001, and her applications were denied. A hearing was held before an Administrative Law Judge (ALJ) on October 5, 2004. Calderon satisfies the insured status requirements for a claim under Title II through March 31, 2003, and must establish that she was disabled on or before that date to prevail on her DIB claim. 42 U.S.C. § 423(a)(1)(A); *Tidwell v. Apfel,* 161 F.3d 599, 601 (9th Cir. 1998). The ALJ issued an opinion on September 29, 2005, finding Calderon not disabled. Calderon timely requested Appeals Council review of the ALJ's decision. By letter dated September 8, 2006, the Appeals Council denied that request, thus making the ALJ's opinion the final decision of the Commissioner. This appeal followed.

## DISABILITY ANALYSIS

The initial burden of proof rests upon the claimant to establish disability. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995). To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

---

[1]  Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed with the Commissioner's Answer.

The Commissioner has established a sequential process of up to five steps for determining whether a person over the age of 18 is disabled within the meaning of the Act. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920. At step one, the ALJ determines if the claimant is performing substantial gainful activity. If she is, the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the twelve month duration requirement. 20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If the claimant does not have such a severe impairment, she is not disabled. *Id.* At step three, the ALJ determines whether a severe impairment meets or equals a "listed" impairment found in the regulations. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the claimant's severe impairment meets or equals a listed impairment, she is disabled. 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the adjudication proceeds beyond step three, the Commissioner must assess the claimant's residual functional capacity (RFC). The claimant's RFC is an assessment of the sustained work-related activities the claimant can still do on a regular and continuing basis, despite the limitations imposed by her impairments. 20 C.F.R. §§ 404.1545, 416.945; Social Security Ruling (SSR) 96-8p.

At step four, the Commissioner must determine whether the claimant retains the RFC to perform work she has done in the past. If the ALJ determines that she retains the ability to perform her past work, the Commissioner will find the claimant not disabled. 20 C.F.R. §§ 404.1520(f), 416.920(f).

When the adjudication reaches step five, the Commissioner must determine whether the claimant can perform any work that exists in the national economy. *Bowen v. Yuckert*, 482 U.S. at 142; 20 C.F.R. §§ 404.1520(g), 416.920(g). Here the burden of production shifts to the

Commissioner to show that a significant number of jobs exist in the national economy that the claimant can do. *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999). If the Commissioner meets this burden, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1566, 416.920(g), 416.966.

## THE ALJ's FINDINGS

At step one, the ALJ found that Calderon has not engaged in substantial gainful activity since the alleged onset of disability. Tr. 27. At step two, the ALJ found that Calderon's medical records established severe impairments of cervical pain, status post carpal tunnel release surgery, an anxiety-related disorder, and a somatoform pain disorder. Tr. 21. He determined, at step three, that Calderon's impairments did not meet or equal the criteria for a listed impairment enumerated in 20 C.F.R. Pt. 404, subpt. P, appendix 1 (Listing of Impairments). Tr. 21, 23. Assessing Calderon's RFC, the ALJ found she was able to perform light work with the ability to stand or walk six out of eight hours, and to sit for six out of eight hours. The ALJ found Calderon had limitations of only occasionally engaging in pushing and pulling the upper extremities; using hand controls frequently, not constantly, and only occasional kneeling, crawling, and climbing ladders, ropes, and scaffolds. Tr. 24. He noted she was a high school graduate, forty-five years old at the date of alleged onset of disability and fifty-four years old at the date of the hearing. Tr. 26.

At step four, the ALJ elicited testimony from an impartial vocational expert (VE). Tr. 511-514. The ALJ agreed with the VE that Calderon was unable to perform her past relevant work which involved repetitive use of her hands. Tr. 26. The ALJ asked the VE whether there were jobs an individual of Calderon's age, education, experience, and RFC was capable of performing. The VE replied Calderon could perform jobs that exist in the national economy including front desk

receptionist, which is sedentary work, and gate guard, which is light work. Tr. 512. The ALJ found Calderon could perform work that exists in significant numbers in the national economy and was not disabled within the meaning of the Social Security Act. Tr. 27.

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *Batson v. Commissioner of Soc. Sec. Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)(citations omitted).

The ALJ is responsible for resolving conflicts in the medical evidence and determining credibility. *Edlund v. Massanari,* 253 F.3d 1152, 1156 (9th Cir. 2001). If the evidence can reasonably support either affirming or reversing the Commissioner's conclusion, the court may not substitute its judgment for that of the Commissioner. *Batson v. Commissioner of Soc. Sec. Admin.*, 359 F.3d at 1193. The Commissioner's decision must be upheld, even if the "evidence is susceptible to more than one rational interpretation." *Andrews v. Shalala*, 53 F.3d at 1039-1040.

## DISCUSSION

Calderon alleges the ALJ erred in determining her RFC by improperly rejecting the opinions of the state agency physicians regarding her mental limitations. Calderon further alleges the ALJ erred in evaluating her credibility and the testimony of the lay witness. Calderon argues that based on the foregoing errors, the ALJ improperly concluded, at step five, that she could perform other work in the national economy.

## I.    Medical Background

Calderon worked at Stanford Hospital as an accounts representative in 1995 and sought treatment for shoulder and neck pain.  Tr.  203-204.  In October 1995, Dr. Edwards diagnosed an adjustment disorder with depressed mood and anxiety, and substance abuse disorder in remission. He noted Calderon experienced "shoulder and neck pain since Sept. 15, 1995 after she decided that she could not work because of treatment by her manager." Tr. 202.  Dr.  Edwards prescribed Prozac and stress classes.  Calderon returned to work, was "doing fine," and decided not to attend the classes.  Tr.  194.  In November 1995, Dr. Edwards continued her prescription for Prozac and diagnosed dysthymia and generalized anxiety disorder.  Tr.  192.

On November 13, 1996, Dr.  Millard diagnosed Calderon with cervical neck pain and bilateral carpal tunnel syndrome (CTS).  He recommended modified job duties, six-hour work days. and ergonomic changes for her work station.  Tr.  220-221.  Dr.  Davidson treated Calderon for neck and shoulder strain and prescribed Vicodin on November 24, 1996.  Tr.  186.  Dr.  Denton treated Calderon on December 2, 1996 for neck strain with ice, Vicodin, and Motrin.  Tr.  184, 247.  On December 5, 1996, Dr. Millard noted Calderon had gone to a hospital emergency room (ER) and was placed on work release and given a sling for her right shoulder. He noted x-rays indicated moderate degenerative disk disease (DDD) at C4-C5, reversal of normal cervical lordosis and subsequent foraminal stenosis on the right at C5 and the left at C4-C5.  Dr.  Millard assessed right C6-C7 radiculopathy.  He recommended prednisone on a tapering course, physical therapy (PT), Tylenol with codeine, and work release until her next examination.  Tr.  247-249.  Dr.  Millard noted Calderon's radiculopathy was stable on December 19, 1996, and that she was somewhat depressed

about her pain.  He recommended an MRI, further tests, PT, and work release until her next examination.  Tr.  245-246.

On February 13, 1997, Dr. Millard noted Calderon's MRI indicated disc protrusions at C4-C5.  He released her to modified work duties in four-hour shifts and recommended an ergonomic evaluation.  Tr.  239-240.  Dr.  Millard noted on March 13, 1997, that Calderon's radiculopathy was stable, she was attending PT, and was anxious to return to work.  He reviewed electromyographic testing findings and found they were consistent with acute right C6-C7 radiculopathy.  Dr.  Millard again released her to modified work duties in four-hour shifts.  Tr.  235-236.  In April 1997, Dr.  Millard noted Calderon had still not returned to work despite being released to modified duties.  He recommended epidural injections and work place ergonomic corrections.  Tr.  232.  Dr.  Millard performed a cervical selective epidural block on May 19, 1997.  Tr.  226.  He noted in June 1997, that Calderon had not returned to work although her cervical radiculopathy was stable.  Dr.  Millard released her to modified work and recommended further nerve conduction studies and work station ergonomic changes.  Tr.  224-225.

Dr.  Millard treated Calderon for radiculopathy and bilateral CTS in July 1997.  He recommended bilateral wrist splints, and emphasized the importance of daily home exercise program of cervicothoracic stabilization.  Dr.  Millard released Calderon to modified work duties and again recommended work station ergonomic changes.  Tr.  222-223.  Dr.  Wilson reviewed the nerve conduction studies and noted evidence of mild left carpal tunnel syndrome with normal findings in the remaining conduction studies.  Tr.  213-217.

Dr. Stark conducted an examination of Calderon for workers compensation purposes on July 9, 1998.  Tr.  250-260.  He noted that Calderon returned to work at Stanford Hospital in September

1997, with ergonomic restructuring of her work station. Dr. Stark's notes indicate Calderon was moved to a different work station and had to do frequent reaching with her right arm. She started getting pain in her right shoulder and requested modifications to her new work station. Calderon moved to Oregon in December 1997, before any further work modifications were made. Tr. 251. Dr. Stark noted Calderon was not working and not looking for work. Calderon had no recommendations for surgery and took Codeine once or twice a month and Naprosyn or Tylenol daily. Dr. Stark noted further that Calderon cleaned house, took care of seven dogs, two goats, and three cats. He also noted she performed gardening activities such as raking, planting, and weeding. *Id.* Calderon also reported that "pulling weeds is an aggravation" and keyboarding was tolerable for a couple of hours. Tr. 252.

Dr. Stark assessed heightened paracervical muscle tension syndrome with underlying cervical spondylosis, intermittent right sided radiculopathy, and probable mild bilateral CTS. Tr. 257. He recommended she not engage in activities involving prolonged maintenance of her neck in a single position, prolonged or repetitive upward gaze, and overhead work activities. Dr. Stark recommended treatment with non-steroid anti-inflammatory drugs (NSAIDS), stretching and strengthening exercises, and avoidance of pain precipitating activities. He further recommended breaks in her day from typing and noted with "appropriate ergonomic modifications, she should be able to perform her job." Tr. 258.

Dr. Ator treated Calderon for chronic depression in October 1998, and prescribed Zoloft. Tr. 266. She also noted Calderon took ibuprofen for her chronic neck and back pain and Vicodin as needed. On January 30, 1999, Calderon went to an ER for low back pain after splitting and sawing wood. She was given prescriptions for Flexeril and Vicodin. Tr. 334. Dr. Ator treated Calderon for chronic neck and shoulder pain in May 1999. She prescribed Vicodin but noted it was

not appropriate for Calderon to continue narcotics for a chronic condition. Dr. Ator also prescribed Prozac for Calderon's depression. Tr. 262. Calderon went to an ER July 14, 1999, with an injury to her right shoulder. Her x-ray was normal and she was fitted with a sling, given a prescription for Vicodin and referred to Dr. Ator. Tr. 331-332.

Calderon was hospitalized from July 25, 1999, to August 2, 1999, for diverticulitis. Tr. 272-292. Dr. Dunn treated Calderon on October 5, 1999, for neck and arm pain. He noted, "she does a lot of heavy work on her farm and this does aggravate her symptoms." Tr. 295. Dr. Dunn found Calderon's cervical spine ROM was limited to 60% in all directions. He diagnosed cervical spondylosis at C4-C5 and possible CTS. Dr. Dunn recommended traction, exercises, NSAIDS, and gave her a prescription for Vicodin. Tr. 296.

Calderon went to an ER on November 8, 1999, because she was "pulled around by her dog" and injured her neck and right shoulder. Tr. 328-330. X-rays indicated degenerative disk disease at C4-C5 with no acute changes. She was fitted with a cervical collar, a shoulder immobilizer, and given prescriptions for Vicodin, Flexeril and Motrin. Tr. 328-329. On November 9, 1999, Dr. Dunn noted Calderon had been doing reasonably well and "then she had a massage that left her with more impairment. She also got depressed, which seemed to be precipitated by the massages, so she went back on her Prozac and is doing reasonably well emotionally at this time." Tr. 294. He also noted she was taking Vicodin and referred her to PT. Tr. 294.

Calderon returned to the ER four times between on December 6, 1999, and May 1, 2000, because of back and neck pain caused by splitting wood, caring for grandchildren, and moving her goats. She declined PT and was treated with injections of Demerol, and prescriptions for Vicodin, Percodan, Flexeril, Percocet and Soma. Tr. 320-327. Dr. Kather treated Calderon on June 22,

2000, for increased pain and neck stiffness after her dogs were jumping on her. He prescribed Percocet, Naprosyn, and Robaxin. Tr. 311.

Calderon went to an ER five times between November 1, 2000, and March 19, 2001. She was treated for pain caused by scraping a french door, lifting her godson, pushing and pulling carts, lifting a heavy suitcase, and lifting her grandchild. Calderon was given Vicodin, Percocet, Demerol, Flexeril, and Robaxin. Tr. 297-300, 315-319. Dr. Kather treated Calderon on March 21, 2001, for back pain after lifting a heavy garage door. He gave her a prescription for Percocet, Robaxin, and Naprosyn. Tr. 310.

Dr. Gentry began treating Calderon in April 2001, for chronic neck pain, depression, and anxiety. He prescribed Ultram for her chronic pain and Remeron for her depression. Tr. 367. In May 2001, Dr. Gentry prescribed Xanax and Alprazolam for depression and anxiety. Tr. 366. Calderon went to the ER in June 2001, for exacerbation of chronic neck and shoulder pain following exercise class and was given prescriptions for Percocet and Skelaxin. Tr. 309. Calderon returned to the ER in August 2001, after she fell carrying hot dog food and burned her leg. Medical notes indicate her neck was supple and she was able to move chin to chest without difficulty. She was given Demerol and Vicodin. Tr. 313. Dr. Gentry continued to treat Calderon for anxiety and depression with medications. He noted she was under considerable situational stress because of financial problems and began having symptoms of panic attacks. Dr. Gentry noted an improvement of her symptoms by October 2001. Tr. 364. Calderon again went to an ER in November 2001, for neck and shoulder pain exacerbated by increased activities and was given Vicodin, Soma, Flexeril, and Motrin. Tr. 312.

In January 2002, Dr. Gentry noted Calderon wanted him to complete a disability form stating she was unable to do any gainful activity, training or work. He noted she is a "very articulate,

functional individual who is obviously reasonably intelligent and not particularly distressed, tearful, depressed or anxious today." Tr. 362. Regarding her request to complete a disability form, Dr. Gentry noted, "I have a hard time endorsing that direction for her and we don't do disability evaluations, this is asking before the fact she can't do anything productive and I am reluctant to go there." *Id.* In March 2002, Dr. Gentry noted Calderon's musculoskeletal complaints were chronic and she took Ultram for these symptoms. He further noted her mental symptoms were stable and she was prescribed Celexa, Buspar and Alprazolam. Tr. 361-362.

Calderon received therapy from Josephine County Mental Health services between February and September 2002. A therapist diagnosed Major Depression and anxiety and assigned Global Assessment of Functioning (GAF) levels between 55 and 61.[2] Tr. 381-405. Calderon cancelled or failed to show for five appointments during this period. *Id.*

Dr. Rawlins, a state agency consultant, completed a psychodiagnostic examination of Calderon on May 2, 2002. Tr. 343-350. He noted she reported panic attacks while going through bankruptcy and would not leave the house without her husband or brother. Tr. 345. Dr. Rawlins found no indication of exaggeration or malingering. He noted Calderon has an average IQ; complained of short term memory loss but passed simple tests of memory; and had unimpaired persistence. Tr. 346. Dr. Rawlins noted Calderon stated she spends her time cleaning, keeping

---

[2]The GAF is a scale from 1-100, in ten point increments, that is used by clinicians to determine the individual's overall functioning. A GAF of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). A GAF of 61-70 indicates some mild symptoms (e.g., depressed mood or insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. The American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders,* 34 (4th ed. 2000).

house, feeding dogs, working on her family's finances, and working on financial problems caused by tax liability. Tr. 347-348. He also noted she may be experiencing a significant somatoform intensification of physical problems. Dr. Rawlins diagnosed panic disorder with agoraphobia; dysthymia disorder, rule out somatoform disorder, rule out personality disorder with obsessive compulsive traits. He assigned a current GAF of 50 and noted Calderon was able to handle funds. Tr. 349-350.

Dr. Solomon, a state agency consultant, completed a neurologic examination on May 7, 2002. Tr. 351-353. He found evidence of degenerative arthritis of the cervical spine with radiculopathy, "although clear dermatomal pattern cannot be identified." Tr. 353. Dr. Solomon found normal reflexes and tone; decreased range of motion in cervical spine; mild rotator cuff syndrome with no evidence of complete tear; bilateral median neuropathy at wrist, with no significant atrophy; and early degenerative arthritis involving the joints on the right hand. *Id.* X-rays of the lumbar spine were essentially normal. Tr. 354.

Dr. Gentry treated Calderon for pain and numbness in both wrists on May 23, 2002, and referred her for nerve conduction studies. Tr. 357. Dr. Kho found the nerve conduction studies indicated a moderately severe left sided CTS and mild right sided CTS. Tr. 406-408. Calderon was referred to Dr Appleby, who performed left CTS release endoscopic surgery on August 23, 2002. Tr. 413. Dr. Appleby performed right CTS release endoscopic surgery on September 6, 2002. Tr. 412. On September 11, 2002, Dr. Appleby noted Calderon was doing fairly well and she would be off work for four more weeks. Tr. 411.

Calderon was treated through 2004 for neck, shoulder and back pain after bending to feed a pet, a gym workout, several weeks of driving, and house painting. She was given Vicodin, Percocet, Flexeril, Soma, Methocarbomol, and Amitryptiline. Tr. 441, 447-448, 451-452, 457-460.

## II. RFC Determination

### A. Physician Opinions

Calderon argues the ALJ failed to properly address the assessment made by state agency consultants on the Mental Residual Functioning Capacity (MRFC) form. Dr. Henry completed the form in June 2002, and it was confirmed by Dr. Anderson on December 9, 2002. Tr. 419-422. Dr. Henry noted moderate limitations in working with new detailed instructions and working in coordination with others and the general public. He noted Calderon would not have difficulty with familiar or previously learned instructions. Dr. Henry found Calderon could work with a group she got to know and could travel to unfamiliar places and make independent plans if provided guidance. Tr. 422.

Social security regulations specify that the most weight is given to the opinions of treating physicians, followed by examining physicians, and the least amount of weight is given to nonexamining experts. *Holohan v. Massanari*, 246 F.3d 1195, 1201-1202 (9th Cir. 2001). The Commissioner relies on medical and psychological consultants to make findings of fact about the nature of a claimant's impairments and the severity of the functional limitations they impose. 20 C.F.R. §§ 404.1527(f), 416.927(f); SSR 96-6p. However, these reviewing sources do not treat or examine the claimant. The opinion of a non-examining physician by itself does not constitute substantial evidence to reject the opinion of a treating or examining physician. *Lester v. Chater,* 81 F.3d 821, 831 (9th Cir. 1995). It may, however, constitute substantial evidence when it is consistent with other evidence in the record. *Andrews v. Shalala*, 53 F.3d at 1041; *Magallanes v. Bowen*, 881 F.2d 747, 752 (9th Cir.1989). The opinions of nonexamining physicians are given weight only to the extent they are supported by the record and consistent with the record as a whole. SSR 96-6p. The

ALJ is not bound by the findings of reviewing consultants, but may not ignore their opinions and must explain the weight given to the opinions in their decision. *Id.*

The ALJ noted the MRFC contained no marked limitations, only moderate and mild limitations, which he found does not preclude all work. Tr. 25. He found the MRFC supported his finding that Calderon was capable of interacting with co-workers as well as the public, although the interaction should not be constant. *Id.* The ALJ also noted the moderate limitations articulated in the MRFC were not consistent with the record. He found Calderon's current part time job as a receptionist, which is a semi-skilled job, supported her ability to perform more than simple routine tasks. *Id.* The ALJ also found her current part-time job "denotes a capacity to be out of the house on her own, and interacting with co-workers and the public." Tr. 23. The ALJ noted Calderon's treating physician, Dr. Gentry, did not endorse disability. Tr. 24. He also noted no psychologist found a "substantial loss of ability to meet any basic work related function." Tr. 25. The ALJ found Calderon was able to maintain a neat appearance, attend appointments, handle her family finances, interact with family and friends, perform chores, care for numerous pets, and, accordingly could perform work on a sustained basis. *Id.*

The ALJ adequately discussed the state agency consultant's opinions regarding Calderon's limitations. He noted he gave significant weight to the assessments of the state agency physicians that Calderon was "not significantly limited" in her ability to meet most basic work-related activities. *Id.* The RFC contains the functional limitations the ALJ found were supported by substantial evidence in the record. The ALJ is not required to include limitations in an RFC he found neither credible nor supported by the record. *Bayliss v. Barnhart,* 427 F.3d 1211,1217 (9th Cir. 2005).

**B. Credibility Determination**

Calderon asserts the ALJ failed to properly evaluate her testimony regarding her limitations. The ALJ must assess the credibility of the claimant regarding the severity of symptoms only if the claimant produces objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms. *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996). Calderon has medically determinable impairments which could produce some of her symptoms. When there is an underlying impairment and no evidence of malingering, an ALJ may discredit a claimant's testimony regarding the severity of symptoms only by providing clear and convincing reasons based on specific findings. *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). The ALJ did not find any evidence of malingering.

In assessing credibility, the ALJ may consider objective medical evidence and the claimant's treatment history. *Smolen v. Chater*, 80 F.3d at 1285. The ALJ found Calderon's assertions of pain and disability inconsistent with information contained in her treatment records, particularly treatment records relating to her numerous visits to the emergency room. Tr. 18. He noted that Calderon did not return to full time work yet continued to "engage in multiple strenuous activities that apparently aggravated her pain symptoms." *Id.* Medical notes indicate these activities included performing heavy work on her farm, painting, lifting heavy objects, pushing and pulling carts, and caring for children and pets. *Id.* The ALJ noted that despite these activities, Calderon asserted to Dr. Solomon that she could not lift more than a pound. *Id.* He also cited the lack of medical evidence to support her level of pain which led to a diagnosis of some sort of somatoform disorder Tr. 21. In addition, the ALJ noted that Calderon's physicians have recommended exercise and accommodations rather than surgery. *Id.*

In addition to objective medical evidence and the claimant's treatment history, the ALJ may also consider compliance with treatment and the effectiveness of medications. *Smolen v. Chater*, 80 F.3d at 1284; SSR 96-7p. The ALJ noted Calderon "failed to show or cancelled appointments on at least five occasions" over a seven month period with her mental health therapist. Tr. 20. The ALJ also noted Calderon's long term treatment with opioid-based pain medications and the reluctance of some treating physicians to continue providing these medications. Tr. 18. He noted Calderon's physicians recommended exercise and avoidance of the strenuous activities that led to her seeking emergency care which resulted in prescriptions for narcotic pain medications.

The ALJ may also employ ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning her symptoms, and other statements by the claimant that appear to be less than candid. *Smolen v. Chater*, 80 F. 3d at 1284. The ALJ noted inconsistencies in Calderon's two reports of activities of daily living (ADL) submitted to the Social Security Administration, and between her reports and statements to physicians. Tr. 21-22. The ALJ noted that Calderon reported in her ADL report of March 2002, she took care of her own grooming, prepared her own meals, did light household chores and cleaning, and went grocery shopping with her husband. She stated she forgets to pay bills so does not handle the family finances. Tr. 22, 101-107. In May 2002, Calderon told Dr. Rawlins she spent her time cleaning, keeping house, feeding her pets, and working on family financial problems due to past owed taxes. She also reported she handled the family finances and had social contact with family and friends. Tr. 21-22, 347-348. Calderon reported in October 2002, she needs help with personal grooming, is unable to handle financial matters, can't remember what she reads, and gets nervous leaving the house. Tr. 22, 154-159.

The ALJ may also consider the claimant's daily activities, work record and the observations of physicians and third parties with personal knowledge about the claimant's functional limitations. *Smolen v. Chater,* 80 F.3d at 1285. The ALJ noted Calderon's husband stated she performed many activities independently, took care of pets, handled money, did some chores, and went to appointments and shopping. Tr. 22. As noted above, the ALJ described the often strenuous activities Calderon engaged in around her farm and in caring for her animals. He also noted Calderon works part time as a front desk receptionist which contradicts her claims of anxiety or panic so extreme as to be unable to work or leave the house. Tr. 25. The ALJ noted the opinion of Dr. Gentry, who did not endorse a finding of disability. Tr. 19.

The ability to perform daily household chores may indicate an ability to work. *Orteza v. Shalala,* 50 F.3d 748, 750 (9th Cir. 1995); *Curry v. Sullivan,* 925 F.2d 1127, 1130 (9th Cir. 1990). On the other hand, a disability claimant does not need to be "utterly incapacitated to be eligible for benefits." *Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir. 1989). Nevertheless, if the claimant's level and type of activity is inconsistent with her claimed limitations, her activities do have a bearing on his credibility. *Id.* The ALJ gave clear and convincing reasons for rejecting Calderon's assertions regarding her inability to do any work. The ALJ's duty is to assess credibility and he did so based on substantial evidence in the record.

### C. Lay Witness Testimony

Calderon asserts the ALJ improperly rejected the written testimony of her husband. Mr. Calderon completed two questionnaires regarding his wife's activities of daily living Tr. 116-127, 142-153. Friends and family members in a position to observe a claimant's symptoms and daily activities are competent to testify as to the claimant's condition. *Dodrill v. Shalala*, 12 F.3d at 918-919. Such testimony cannot be disregarded without comment. *Nguyen v. Chater*, 100 F.3d 1462,

1467 (9th Cir. 1996).  If the ALJ wishes to discount lay witness testimony, he must give reasons that are germane to the witness.  *Id.* (citing *Dodrill v. Shalala,* 12 F.3d at 919).  Inconsistency with medical evidence is one such reason.  *Lewis v. Apfel,* 236 F.3d 503, 511 (9th Cir. 2001).

The ALJ noted he considered Mr. Calderon's testimony and found much of it "supportable." Tr. 22.  He also noted the testimony indicated Calderon could take care of personal grooming, do some chores, shop, interact appropriately with family members, care for pets, and handle money responsibly.  However, the ALJ found some of Mr. Calderon's statements, particularly the statement that it takes his wife "a half a day" to get dressed, were not supported by the medical evidence or by the record.  *Id.*  The ALJ noted Calderon's ability to report to a part-time job and work an eight- hour day was also inconsistent with this statement.  In addition, the ALJ noted the state agency consultants assessed only mild restrictions in her activities of daily living.  Tr. 22.

The ALJ provided germane reasons for discounting some of Mr. Calderon's testimony.  *See, Lewis v. Apfel*, 236 F.3d at 511-512.  The ALJ was not required to accept Mr. Calderon's conclusions regarding Calderon's disability, which is the province of the Commissioner.  *See,* 20 C.F.R. §§ 404.1527, 416.927, SSR 96-5p.

### D. Conclusion

The determination of the RFC, which is a vocational decision, is based on the entire record and rests with the ALJ.  20 C.F.R. §§ 404.1546, 416.946; SSR 96-5p.  The ALJ found that although Calderon had impairments which caused some limitations, these conditions did not prevent her from performing any work .  The ALJ gave legally sufficient reasons based on substantial evidence in the record for assessing Calderon's RFC.

### III. Step Five Determination

#### A. Transferable Skills

The ALJ found Calderon could not perform her past relevant work, which was semi-skilled work, because it required repetitive use of the hands. Tr. 26. The ALJ found Calderon capable of performing a significant range of light work. He noted if Calderon could perform the full range of light work she would be found not disabled under the Medical-Vocational Guidelines (Guidelines).[3] However, since Calderon has additional limitations, the ALJ stated he was using the Guidelines as a framework for his decision and transferability of skills was therefore not at issue.

Social Security Rulings (SSR) address how to use the Guidelines when there are nonexertional and exertional limitations:

> Where a person cannot be found disabled based on strength limitations alone, the rule(s) which corresponds to the person's vocational profile and maximum sustained exertional work capability (Table No. 1, 2, or 3) will be the starting point to evaluate what the person can still do functionally. . . .
>
> A particular additional exertional or nonexertional limitation may have very little effect on the range of work remaining that an individual can perform. The person, therefore, comes very close to meeting a table rule which directs a conclusion of "Not Disabled." On the other hand, an additional exertional or nonexertional limitation may substantially reduce a range of work to the extent that an individual is very close to meeting a table rule which directs a conclusion of "Disabled."

SSR 83-14, * 3, 1983 WL 31254. The ALJ determined Calderon's nonexertional limitations were occasionally engaging in pushing and pulling the upper extremities; using hand controls frequently, not constantly; and only occasional kneeling, crawling, and climbing ladders, ropes, and scaffolds. The issue in using the Guidelines is whether a nonexertional limitation is an important factor in a

---

[3]An individual aged 50-55 with a high school education, limited to light work, whose previous work experience was skilled or semiskilled, and whose skills are not transferable, would be found not disabled. The same individual whose skills were transferable would also be found not disabled. 20 C.F.R. Pt. 404, subpt. P, app.2., Rules 202.14, 202.15.

particular range of work, e.g., crawling is very rare in sedentary work, but an important element in heavy work such as coal mining. SSR 85-15, * 2, 1985 WL 56857. "Relatively few jobs in the national economy require ascending or descending ladders and scaffolding." SSR 83-14, *2, 1983 WL 31254. Calderon's nonexertional limitations do not appear to be important factors in jobs such as front desk receptionist.

Calderon argues that SSR 82-41 requires the ALJ to make a finding of transferability of skills for other work that is skilled or semi-skilled. The VE testified Calderon could perform other work that was semi-skilled. The Commissioner argues whether or not the ALJ was required to specifically articulate a finding of transferability, the ALJ adopted the VE testimony that Calderon had transferable skills from her past jobs. The VE testified Calderon had transferable skills of interacting with the public and co-workers that would enable her to work as a front desk receptionist and gate guard. Tr. 27, 512-513.

Calderon further argues that the ability to work with the public and co-workers is not a skill. Skills are "acquired through performance of an occupation which is above the unskilled level." SSR 82-41 *2, 1982 WL 31389. In semi-skilled occupations, "[s]kills refer to experience and demonstrated proficiency with work activities in particular tasks or jobs. " *Id* at *3. Calderon's past relevant work was as an admissions clerk and an accounts representative. Calderon testified her current part time work as a front desk receptionist requires answering the phone, taking messages and greeting people. Tr. 484-485. The front desk receptionist job identified by the VE requires greeting and directing people and occasionally answering the phone. Tr. 512. Appropriate interaction with the public is a basic work activity, or skill, of these jobs. There is no dispute Calderon has "demonstrated proficiency" in the basic work activities of a front desk receptionist.

Calderon also argues that the jobs identified by the VE are at a low skill level, SVP 3, and as such are little more than unskilled work, which typically have no transferable skills. This argument supports the rationale of the ALJ to use the Guidelines rather than determining transferability. Calderon further argues that if her skill levels are only the low level skills involved in an SVP 3[4] job, she has no vocational advantage over an unskilled worker, and thus has no real transferable skills. However, the VE testified Calderon's past and current jobs were SVP 4 and SVP 5, not SVP 3. It is her job skills from her past relevant work at SVP 4 and SVP 5 jobs that are transferrable to the less demanding SVP 3 jobs identified by the VE.

**B. Conclusion**

The ALJ determined that transferability was not an issue and used the Guidelines as a framework to determine Calderon was not disabled. Even if the ALJ should have made a specific determination regarding transferability of skills, he did so by adopting the testimony of the VE. Any error here was harmless as it makes no difference in the disability decision. *Stout v. Commissioner, Soc. Sec. Admin.,* 454 F.3d 1050, 1055 (9th Cir. 2005). It is clear that Calderon has transferable skills, she uses those skills in her current job, and could use them in the job identified by the VE. The ALJ's decision that Calderon could perform jobs in the national economy was based on correct legal standards and substantial evidence in the record.

---

[4]SVP level is the specific vocational preparation time required to learn a job. SVP 3 is a job that requires over one month up to and including three months. SVP 4 is a job that requires over three months up to and including six months. *Dictionary of Occupational Titles,* Appendix C, Part II. Available at www.occupationalinfo.org/appendxc_1.html#II. Last viewed October 31, 2007.

## CONCLUSION

Based on the foregoing, the ALJ's decision that Calderon is not disabled under the Social Security Act is based on correct legal standards and supported by substantial evidence and should be affirmed. A judgment should be entered dismissing this case with prejudice.

## SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due November 15, 2007. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

IT IS SO ORDERED.

DATED this 1st day of November, 2007.


_____/s/ Paul Papak_____
Paul J. Papak
United States Magistrate Judge